UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                                          :

RODERICK NIXON,                          :

                                :

             Plaintiff,           :

                                :           23 Civ. 5218 (JPC)

              -v-                    :

                                :       <u>OPINION AND ORDER</u>

SOURCE DIGITAL, INC., a New York corporation,   :
individually and doing business as "The Source"; and  :
DOES 1-10,                      :

                                :

             Defendants.       :

                                :
----------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      In this suit for willful copyright infringement, Roderick Nixon claims that Source Digital, Inc. ("SDI") violated his exclusive rights in four photographs depicting well known hip-hop artists by posting the photos to its Instagram account without permission.  SDI admits that it posted the photos without Nixon's consent, but says that it did so for the fair-use purposes of providing commentary and educating the public on the cultural significance of hip-hop, past and present.  SDI also maintains that any infringement of Nixon's rights was not willful on its part.

      Nixon now moves for summary judgment against SDI on the issues of copyright infringement and willfulness.  Nixon also moves for summary judgment against an entity that is not a party to this case, Northstar Source Group, LLC ("Northstar"), on a claim for vicarious liability and contributory infringement.  Because there is no genuine dispute of material fact concerning SDI's copying of Nixon's photographs and SDI's fair use defense fails as a matter of law, the Court grants summary judgment in favor of Nixon on his copyright infringement claim against SDI.  Whether SDI infringed Nixon's copyrights willfully, however, is a question that only

a trier of fact can answer on this record.  And because Northstar is not a party to this case, Nixon cannot obtain summary judgment against it.  Thus, the Court grants Nixon's motion in part and denies it in part.

## I.  Background

### A.    Factual Background[1]

Nixon, known professionally as "Nitro," is a photographer who took a series of photographs during the 1990s that "depicted famous and iconic hip-hop artists."  Nixon Decl. ¶¶ 2-3.  As relevant to this litigation, those photographs include: (1) a photo of the artists P. Diddy, Notorious B.I.G., and Aaliyah (the "P. Diddy Photograph"); (2) a photo depicting Lil' Kim, Notorious B.I.G., and the R&B group 112 (the "Lil' Kim Photograph"); (3) a photo of Foxy Brown, Lil' Kim, Da Brat, and several others (the "Foxy Brown Photograph"); and (4) a photo of Notorious B.I.G., Nate Dogg, Snoop Dogg, and P. Diddy (the "B.I.G. Photograph").  Nixon 56.1 Stmt. ¶¶ 7-13.  Nixon is the sole owner of all rights to these photographs, which are collectively referred to as the "Subject Photographs."  *Id.* ¶ 6.  On February 18, 2020, Nixon received a copyright registration for the Subject Photographs.  *Id.* ¶ 5.  Prior to 2023, Nixon had publicly displayed the Subject Photographs on various online platforms, which listed their owner as "Nitro."  *Id.* ¶ 21.

---

[1] The facts relied on throughout this Opinion are considered in the light most favorable to SDI and are taken from Nixon's and SDI's statements of undisputed material facts submitted pursuant to Local Civil Rule 56.1(a), Dkts. 40 ("Nixon 56.1 Stmt."), 47 ("SDI 56.1 Stmt."), as well as the declarations filed in support of and in opposition to Nixon's motion for summary judgment and the supporting exhibits attached to those declarations, Dkts. 41 ("Nixon Decl."), 42 ("Paladino Decl."), 48 ("McMillan Decl.").  Unless otherwise noted, the Court cites only to a party's Rule 56.1 Statement where the adverse party does not dispute the fact, has offered no admissible evidence to refute that fact, simply seeks to add its own "spin" on the fact, or otherwise disputes only the inferences that can be drawn from the stated fact.

SDI operates the digital platform of *The Source*, a "news magazine focusing on Hip-Hop, urban culture, politics, and lifestyle." SDI 56.1 Stmt. ¶ 67. In that capacity, SDI publishes thousands of pieces of content each year related to those topics on its website, www.thesource.com, and through its accounts on social media. *Id.* ¶¶ 68-69. SDI largely relies on independent contractors, known as "contributors," to create and publish content under its name on its online platforms. *Id.* ¶ 70. These contributors "control the manner in which their content is created, including by choosing their own topics and sources." *Id.*

One of the social media platforms SDI utilizes is Instagram, on which SDI controls, owns, and operates an account with the username "@thesource." Nixon 56.1 Stmt. ¶ 1. According to SDI's Chairman, the @thesource Instagram account "curates, aggregates and provides commentary on images and other content of cultural relevance to Hip Hop, both in a contemporary and historical context, in order to celebrate, preserve and educate as to the cultural and historical legacy of Hip Hop and maintain its relevance." McMillan Decl. ¶ 12. Photos posted to SDI's Instagram account usually include hashtags that help to "identify and organize" the posts. SDI 56.1 Stmt. ¶ 83. For instance, "SDI requests that when the contributors post content that has historical significance, they should use the hashtag #sourceclassics." *Id.* ¶ 84. Some posts on SDI's Instagram page have also included the hashtag "#goldenera," which SDI describes as "referring to the period from the mid-1980s to the mid-1990s." *Id.* ¶ 87. While SDI generally does not run advertisements on the photos posted to its Instagram account, it has used the Instagram account for advertising campaigns on at least two occasions in the past. Nixon 56.1 Stmt. ¶ 31; SDI 56.1 Stmt. ¶ 82. SDI's Instagram page also contains a link to its website. Nixon 56.1 Stmt. ¶ 32. And SDI earns revenue from advertising on its website. *Id.* ¶ 30.

SDI maintains copyright policies that apply to content created and posted by its contributors, including on its Instagram account. *Id.* ¶ 59. Under those policies, contributors may only use images from specified sources, including Shutterstock, images subject to a Creative Commons license, or images that are owned or licensed by SDI itself. *Id.* ¶ 57. SDI's contributors are required to "exhibit [an] understanding of [its] copyright policy and procedures," *id.* ¶ 54, and only contributors approved by SDI are able to post content to its Instagram page, *id.* ¶ 45. SDI also makes attorneys available to consult on legal issues that may arise concerning the publication of content on SDI's platforms. McMillan Decl. ¶¶ 41-43. Although its policies contain no enforcement procedures as such, Nixon 56.1 Stmt. ¶ 41, SDI maintains that it "has disciplined and terminated its contributors for violating its copyright policies, and where appropriate, has taken legal action against more egregious contributors," McMillan Decl. ¶ 27. SDI also claims that, since 2019, it "has taken numerous measures to address copyright infringement, including disciplining and terminating contributors for violation of copyright policies, as well as discussion of the policies and their implementation and enforcement, formally and informally in meetings and individual discussions." *Id.* ¶ 28.

Nixon's infringement claim is based on five posts of the Subject Photographs on SDI's @thesource Instagram account. SDI's contributors published the P. Diddy Photograph to SDI's Instagram account on July 13, 2019, and then again on July 2, 2020. Nixon Decl., Exh. 2; Nixon 56.1 Stmt. ¶¶ 7-8. Those Instagram posts each included a brief caption as well as a number of hashtags, such as "#diddy," "#hiphop," "#throwbackthursday," "#goldenera," and "#thesource." Nixon Decl., Exh. 2. On February 3, 2023, Nixon sent a cease-and-desist letter concerning the two posts, leading to both posts being removed from display a few days later, on February 7, 2023. SDI 56.1 Stmt. ¶ 101.

SDI contributors posted the Lil' Kim Photograph, the Foxy Brown Photograph, and the B.I.G. Photograph to SDI's Instagram account on August 29, 2023, September 16, 2023, and September 19, 2023, respectively.  Nixon 56.1 Stmt. ¶¶ 11-13.  Each of those posts was also accompanied by a short caption and several hashtags.  Nixon Decl., Exhs. 3-5.  Nixon sent a cease-and-desist letter regarding these three posts on October 12, 2023, and SDI removed each of the posts from display on that same day.  SDI 56.1 Stmt. ¶ 102.

Nixon has never authorized or licensed SDI to use any of the Subject Photographs.  Nixon 56.1 Stmt. ¶¶ 25-26.

**B.    Procedural History**

Nixon filed this action on June 20, 2023.  Dkt. 1.  The operative Second Amended Complaint names SDI and Does 1-10 as Defendants, and asserts causes of action for copyright infringement and vicarious liability/contributory infringement.  Dkt. 29.  The Second Amended Complaint does not name Northstar as a Defendant, and Northstar is not currently a party to this case.  *See id.*

On July 1, 2024, following a period of discovery, Nixon moved for summary judgment against SDI on the issues of copyright infringement and willfulness.  Dkts. 38, 39 ("Motion").  And despite Northstar not being a party to this case, Nixon also moved for summary judgment against Northstar on his claim for vicarious liability and contributory infringement.  Motion at 13-16.  SDI opposed Nixon's Motion on July 15, 2024, raising a fair use defense to Nixon's copyright infringement claim and arguing that there is a genuine dispute of material fact concerning whether any alleged infringement was willful.  Dkt. 46 ("Opposition").  SDI's counsel, despite not having entered any notices of appearance on behalf of Northstar, also purports to oppose Nixon's Motion as to that non-party.  *Id.* at 25-30.  Nixon filed a reply one week later, in which he changes course

and requests summary judgment on the vicarious liability and contributory infringement claim against SDI instead. Dkt. 50 ("Reply").

On July 18, 2024, the Honorable Denise L. Cote of this District issued an Opinion and Order granting summary judgment in favor of another professional photographer on a similar copyright infringement claim against SDI. *See Shihab v. Source Digit., Inc.*, No. 23 Civ. 7266 (DLC), 2024 WL 3461351, at *1 (S.D.N.Y. July 18, 2024).

## II. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant "to present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks omitted). The non-movant must present more than a mere "scintilla of evidence." *Anderson*, 477 U.S. at 252.

### III.  Discussion

**A.      Nixon Is Entitled to Summary Judgment on His Copyright Infringement Claim and SDI's Fair Use Defense Fails as a Matter of Law.**

The Copyright Act reserves to copyright owners a bundle of "exclusive rights" to the works that they own, including the rights of reproduction, distribution, public display, and preparation of derivative works.  17 U.S.C. § 106.  The statute also provides copyright owners a private right of action for copyright infringement against "[a]nyone who violates any of the exclusive rights" guaranteed by Section 106.  *Id.* § 501(a)-(b).  To prevail on that cause of action, the rightsholder must prove: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Ferdman v. CBS Interactive Inc.*, 342 F. Supp. 3d 515, 524 (S.D.N.Y. 2018) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

Consistent with copyright law's fundamental purpose of "promot[ing] the Progress of Science and useful Arts," U.S. Const., Art. I, § 8, cl. 8, the Copyright Act allows would-be infringers to assert a defense of "fair use."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994).  Section 107 of the Copyright Act, which "indicates, rather than dictates, how courts should apply" the fair use doctrine, provides a non-exclusive list of non-dispositive factors that typically comprise the core of the analysis:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 18 (2021) (quoting 17 U.S.C. § 107) (internal quotation marks omitted).  Common forms of fair use include making copies of a protected work

"for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research." 17 U.S.C. § 107.  In essence, "[t]he fair use doctrine 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'"  *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith* ("*Warhol II*"), 598 U.S. 508, 527 (2023) (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).  But because the fair use doctrine operates as an affirmative defense to a copyright infringement claim, "the party asserting fair use bears the burden of prov[ing]" that it applies in a particular case.  *Authors Guild v. Google, Inc.* ("*Google Books*"), 804 F.3d 202, 213 (2d Cir. 2015) (first citing *Campbell*, 510 U.S. at 590; then citing *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 918 (2d Cir. 1994)).

In this case, there is no genuine factual dispute that Nixon has established the elements of a copyright infringement claim against SDI.  The undisputed portions of the factual record indicate that Nixon took each of the Subject Photographs himself back in the 1990s and never transferred his rights in those photos to anyone else.  *See* 17 U.S.C. § 201(a) ("Copyright in a work . . . vests initially in the author or authors of the work.").  SDI, through its contributors, later posted the Subject Photographs to its public Instagram account without Nixon's permission, and in doing so violated at least Nixon's exclusive rights to reproduce, publicly display, and create derivatives of those works.  *See id.* § 106(1), (2), (5).  Accordingly, there is no genuine dispute of material fact as to the validity of Nixon's ownership of the Subject Photographs or as to SDI's encroachment on his exclusive rights in them.

SDI, however, asserts the fair use defense as a complete bar to liability.  Opposition at 7.  The availability of the fair use defense, as a mixed question of law and fact, is properly addressed on a motion for summary judgment consistent with the usual Rule 56(a) standard.  *See Cariou v. Prince*, 714 F.3d 694, 704 (2d Cir. 2013).  For the reasons discussed below, the Court agrees with

Nixon that there are no genuine disputes of material fact concerning fair use, and that the defense fails as a matter of law.  Nixon is therefore entitled to summary judgment on his copyright infringement claim against SDI.

### 1.  The Purpose and Character of the Use

The first statutory factor considers the "purpose and character" of the defendant's use of the protected work.  17 U.S.C. § 107(1).  This factor has come to be understood primarily in terms of whether the secondary use was "transformative"—"that is, whether the new work merely supplants the original, 'or instead adds something new, with a further purpose or different character, altering the [original] with new expression, meaning, or message.'"  *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 179 (2d Cir. 2024) (alteration in original) (quoting *Campbell*, 510 U.S. at 579); *see also Fox News Network, LLC v. Tveyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018) ("[T]he primary inquiry is whether the use communicates something new and different from the original or otherwise expands its utility, that is, whether the use is transformative." (internal quotation marks omitted) (alteration adopted)).  Thus, a defendant's "use of copyrighted material that merely repackages or republishes the original is unlikely to be deemed a fair use."  *Tveyes*, 883 F.3d at 177 (internal quotation marks omitted).

The concept of transformativeness, however, "cannot be taken too literally."  *Google Books*, 804 F.3d at 214.  That is so because "[m]ost copying has some further purpose" compared to the original, and "[m]any secondary works add something new."  *Warhol II*, 598 U.S. at 528-29 ("[A]n overbroad concept of transformative use, one that includes any further purpose, or any different character, would narrow the copyright owner's exclusive right to create derivative works.").  So to preserve the author's right to create derivative works, "the degree of transformation must 'go beyond that required to qualify as a derivative'" under the Copyright Act.  *Hachette Book Grp.*, 115 F.4th at 180 (quoting *Warhol II*, 598 U.S. at 529); *see also* 17 U.S.C.

§ 101 (defining a "derivative work" as "a work based upon one or more preexisting works . . . or any other form in which a work may be recast, transformed, or adapted").  Transformativeness, in other words, is a matter of degree: "The larger the difference, the more likely the first factor weighs in favor of fair use.  The smaller the difference, the less likely."  *Warhol II*, 598 U.S. at 529.  And in assessing transformativeness, courts must conduct "an objective inquiry into what use was made,"  which "cannot turn merely on the stated or perceived intent of the artist or the meaning or impression that a critic—or for that matter, a judge—draws from the work."  *Id.* at 545 (internal quotation marks omitted); *see also Cariou*, 714 F.3d at 707 ("What is critical is how the work in question appears to the reasonable observer, not simply what an artist might say about a particular piece or body of work.").

Under these standards, SDI's use of the Subject Photographs was nowhere close to transformative.  SDI's contributors simply posted the Subject Photographs, in their entirety, to its Instagram account with no attempt at alteration whatsoever.  And apart from the Subject Photographs themselves, each Instagram post contained only a short caption and smattering of hashtags.  SDI maintains that the purpose of these Instagram posts was to "provide commentary, preserve, and educate the public on the cultural significance of Hip Hop and its relevance." Opposition at 15-16.  But the "commentary" appended to each post—if it can be called that at all— was razor-thin.  *See McGucken v. Newsweek LLC*, 464 F. Supp. 3d 594, 606 (S.D.N.Y. 2020) (explaining that "the mere addition of some token commentary is not enough to transform the use of a photograph").  The captions, for the most part, merely identified the individuals in the Subject Photographs and, at least once, provided some background information on when the photo was taken.  *See, e.g.*, Nixon Decl., Exh. 2 (P. Diddy Photograph) ("It's all good Baby, Babyyyy!  Puff, Aaliyah and B.I.G"); *id.*, Exh. 4 (Foxy Brown Photograph) ("On the Set: (1996) Total with Foxy

Brown, Lil' Kim and Da Brat on set for Total's 'No One Else' remix."). Nor was anything of genuine substance added through the inclusion of hashtags like "#sourceclassics," "#culture," and "#goldenera." *See Shihab*, 2024 WL 3461351, at *5 ("Simply adding a list of hashtags to [a] post is not commentary.").

Instead, the manifest purpose of the Instagram posts closely mirrored that of Nixon in taking the Subject Photographs in the first place: to document and portray significant figures in the hip-hop industry and their careers. *See Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 351-52 (S.D.N.Y. 2017) ("[The defendant's] use of the Images had no transformative effect because it displayed the Images in the same manner and for the same purpose as they were originally intended to be used."); *Psihoyos v. Nat'l Exam'r*, No. 97 Civ. 7624 (JSM), 1998 WL 336655, at *3 (S.D.N.Y. June 22, 1998) ("The [defendant's] use is not transformative, because its piece uses the photo to show what it depicts."). The self-evident identity of purpose between the Subject Photographs and the Instagram posts is not undermined by SDI's contention that its "use was not to present a *contemporaneous* image of these hip hop artists interacting with one another," but instead to allow users to experience the images "in a specific cultural or historical context by associating them with similar types of content" via hashtags. Opposition at 15-16 (emphasis added). "To be transformative, a use must do 'something more than repackage or republish the original copyrighted work.'" *Hachette Book Grp.*, 115 F.4th at 181 (quoting *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014)). Yet that is exactly what SDI's Instagram posts did, notwithstanding the inclusion of hashtags. *See Shihab*, 2024 WL 3461351, at *5 ("Adding hashtags to [a] post, for instance, #sourceclassics or #culture, does not transform the image or create a transformative use."). Taken to its logical conclusion, SDI's position would eviscerate the legal protections for photographs of historically significant figures as long as any

copying done through social media occurs some number of years into the future or is accompanied by hashtags that allow users to filter for specific types of content. Thus, the Court concludes that SDI's use of the Subject Photographs was not transformative.

In addition to transformativeness, the first fair use factor considers whether the secondary use "is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). "[T]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006) (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985)). The commercial motivation of a use, however, is not dispositive; indeed "nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, . . . are generally conducted for profit in this country." *Campbell*, 510 U.S. at 584 (internal quotation marks omitted); *see also Google*, 593 U.S. at 32 ("There is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use. But the inverse is not necessarily true, as many common fair uses are indisputably commercial."). Nevertheless, the commercial nature of a secondary use remains "relevant" to the fair use analysis, especially when the "original work and a secondary use share the same or highly similar purposes." *Warhol II*, 598 U.S. at 532-33, 537 ("The undisputed commercial character of [a secondary] use, though not dispositive, tends to weigh against a finding of fair use." (internal quotation marks omitted)); *Tveyes*, 883 F.3d at 178 (similar).

The Court agrees with Nixon that SDI's use of the Subject Photographs was commercial in nature. Although SDI did not run advertisements on its Instagram posts themselves, there is no dispute that its Instagram account linked to its website, www.thesource.com, and that SDI earned

advertising revenue from that website. Thus, the more engagement it could cultivate on its Instagram account, the higher the probability that traffic would be directed back to its website. SDI counters that it received only minimal traffic to its website from its Instagram page because it did not include its website link in every post (including in its posts of the Subject Photographs), but only on its main profile page. Opposition at 14. But the fact that SDI could have done a better job of monetizing its Instagram posts does not undercut the fundamentally commercial nature of those uses. Plus, SDI has also conducted promotional campaigns on its Instagram account. And having more engagement with its Instagram account would naturally tend to make those campaigns more lucrative. At the very least, using the Subject Photographs to cultivate a following on social media and drive engagement with the hip-hop scene would have tended to increase the overall awareness and value of SDI's own brand. *See Shihab*, 2024 WL 3461351, at *5 ("[SDI] is a commercial enterprise, seeking to profit from the revenue that accrues to [*The Source*] and its website. The celebration of hip-hop is the engine that drives its for-profit business."). By contrast, for the reasons described above, SDI's claim that its posts of the Subject Photographs served an educational or critical purpose ring hollow. The Court therefore agrees that SDI's posts of the Subject Photographs were for commercial, rather than non-profit, purposes.

Finally, SDI urges that it acted in good faith (or least not in significantly bad faith) in exploiting the Subject Photographs. Opposition at 16-17. SDI, for instance, points out that the Subject Photographs did not contain any obvious indicia of legal protection, such as copyright notices, and that it responded to each of Nixon's cease-and-desist letters by promptly removing the offending Instagram posts. *Id.* The Court does not dwell long on the question of SDI's good faith (or lack thereof). Although the Supreme Court has suggested that "[f]air use presupposes good faith and fair dealing," *Harper & Row*, 471 U.S. at 562-63 (internal quotation marks omitted),

more recently the Supreme Court has "expressed some skepticism" about "whether good faith is as a general matter a helpful inquiry," *Google*, 593 U.S. at 32.  Similarly, the Second Circuit has explained that the defendant's good or bad faith "generally contributes little to fair use analysis." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 479 n.2 (2d Cir. 2004).  For purposes of this case, it suffices to say that the record discloses no reason why SDI, by virtue of any supposed bad faith, should be precluded from otherwise raising a fair use defense.  But because SDI's use of the Subject Photographs was commercial in nature and not even minimally transformative, whatever good faith it might have shown in dealing with Nixon does not overcome the Court's conclusion that the first statutory factor weighs against a finding of fair use.

### 2. The Nature of the Copyrighted Work

The second fair use factor considers "the nature of the copyrighted work."  17 U.S.C. § 107(2).  "Courts have generally adopted two types of distinctions in their analysis of the second factor: (1) whether the work is express[ive] or creative, such as a work of fiction, or more factual with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower."  *Harbus v. Manhattan Inst. for Pol'y Rsch., Inc.*, No. 19 Civ. 6124 (ER), 2020 WL 1990866, at *6 (S.D.N.Y. Apr. 27, 2020) (citing *Blanch v. Koons*, 467 F.3d 244, 257 (2d Cir. 2006); *Harper & Row*, 471 U.S. at 540).  This factor, however, "rarely play[s] a significant role in the determination of a fair use dispute."  *Hachette Book Grp.*, 115 F.4th at 187 (internal quotation marks omitted).

As to this factor, SDI primarily argues that the Subject Photographs "fall on the factual end of the spectrum" because they "do not reflect significant direction by [Nixon]" and "were taken as their subjects naturally appeared, in the settings they happened to be in, without altered lighting or backgrounds."  Opposition at 18.  The Court agrees that while Nixon "in all likelihood made

choices as a photographer about lighting, angle, and the shutter speed of the camera lens" in taking the Subject Photographs, "[t]he value of the [Subject Photographs] appears to stem principally from the subject matter of the photograph[s] rather than artistic expression or the skill of the photographer." *Shihab*, 2024 WL 3461351, at *6. At the same time, the Subject Photographs may not fall entirely on the factual end of the spectrum either. The P. Diddy Photograph, for instance, appears to have been taken at a low angle in a manner that accentuates the subjects' personas. *See* Nixon Decl., Exh. 2. The Foxy Brown, Lil' Kim, and B.I.G. Photographs, meanwhile, capture their subjects in tightknit poses that create a nostalgic, almost familial atmosphere. *See id.*, Exhs. 3-5. The record, however, is largely devoid of evidence regarding whether and to what extent any of the more potentially creative attributes of the Subject Photographs were the product of Nixon's artistic choices. Recognizing that this factor is not outcome-determinative in this case, the Court concludes that the creative versus factual nature of the Subject Photographs "weighs neither strongly in favor of nor against the fair use defense." *Shihab*, 2024 WL 3461351, at *6 (analyzing a similar photograph of two members of the Wu Tang Clan).

Finally, SDI notes that the Subject Photographs had been published prior to at least its 2023 Instagram posts. Opposition at 18. That fact favors its assertion of the fair use defense as to those posts. *See Harbus*, 2020 WL 1990866, at *6; *Ferdman*, 342 F. Supp. 3d at 539.

### 3.  The Amount and Substantiality of the Use

The third fair use factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This factor reflects the notion that "a finding of fair use is more likely when small amounts, or less important [portions], are copied than when the copying is extensive, or encompasses the most important parts of the original." *Google Books*, 804 F.3d at 221.

Because SDI's Instagram posts copied each of the Subject Photographs in its entirety and did so in a wholly non-transformative manner, this factor weighs against a finding of fair use. *Otto v. Hearst Commc'ns, Inc.*, 345 F. Supp. 3d 412, 431 (S.D.N.Y. 2018); *see also Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 45-48 (2d Cir. 2021). This factor, however, "weighs less when considering a photograph—where all or most of the work often must be used in order to preserve any meaning at all—than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value." *Ferdman*, 342 F. Supp. 3d at 539 (internal quotation marks omitted); *see also N. Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 621 (S.D.N.Y. 2015) (collecting cases). Although SDI copied the entirety of the Subject Photographs, it is difficult to see (apart from, perhaps, some superficial cropping) how it could have used any less while still presenting visually coherent images. Accordingly, while this factor favors Nixon, it does so less than if SDI had copied, for example, an entire novel.

### 4. The Effect of the Use on the Market for the Original

The fourth and final fair use factor concerns "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor typically "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *Google Books*, 804 F.3d at 223. Thus, the key question is whether the secondary use "usurps the market for the [original] by offering a competing substitute." *Hachette Book Grp.*, 115 F.4th at 189 (internal quotation marks omitted). But this factor requires courts to consider "not only the market harm caused by the particular actions of the alleged infringer, but also the market harm that would result from unrestricted and widespread conduct of the same sort." *Id.* (internal quotation marks omitted). For example, it is widely accepted that "a copyright holder is entitled to demand a royalty for licensing

others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." *Tveyes*, 883 F.3d at 180 (internal quotation marks omitted). Nevertheless, "[o]nly an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets should be legally cognizable when evaluating a secondary use's effect upon the potential market for or value of the copyrighted work." *Id.* (internal quotation marks omitted). All in all, the consideration of market effects is "undoubtedly the single most important element of fair use." *Hachette Book Grp.*, 115 F.4th at 189 (quoting *Harper & Row*, 471 U.S. at 566).

In this case, the market effects of SDI's secondary use weighs against a finding of fair use. As the Court explained in analyzing first and third fair use factors, SDI's offending Instagram posts copied the Subject Photographs in their entirety, without any substantial transformation, and for a commercial purpose. By copying the Subject Photographs for non-transformative, commercial purposes "without payment of [the] customary licensing fee," SDI has "usurped a market that properly belongs to the copyright holder," Nixon. *Hachette Book Grp.*, 115 F.4th at 192 (alternation in original) (internal quotation marks omitted); *see also Ferdman*, 342 F. Supp. 3d at 541 (applying a "presumption of market harm" under similar circumstances).

SDI's argument that the record reflects the "absence of a social media or digital usage licensing market for [the Subject Photographs]" is unpersuasive. Opposition at 20. To the contrary, the record reveals that SDI has paid to license photographs in the past for use on its website and Instagram account, Nixon 56.1 Stmt. ¶ 33, indicating that "there is a plausibly exploitable market" for photographers to license photographs to organizations like SDI for use on its online platforms. *Tveyes*, 883 F.3d at 180. Indeed, courts have recognized that uses like SDI's are "paradigmatic of the only market the photographs could reasonably have: licensing to media

outfits." *Ferdman*, 342 F. Supp. 3d at 541 (internal quotation marks omitted); *see Bill Graham Archives*, 448 F.3d at 614 (explaining that courts may "look at the impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets" in assessing market harm (internal quotation marks omitted)).  And, even if there is no currently existing market for the Subject Photographs in particular, allowing for-profit media organizations like SDI free reign to appropriate celebrity photographs to promote their brand and drive engagement on social media "would seriously damage the rights of professional photographers who own copyrights in their photographs." *Shihab*, 2024 WL 3461351, at *7 (observing that "widespread copying of the works of professional photographers without licensing their works would damage an entire profession"); *see Tveyes*, 883 F.3d at 179 (noting that the fourth factor "requires consideration of 'not only the . . . market harm caused by the particular actions of the alleged infringer,' but also the market harm that would result from 'unrestricted and widespread conduct of the [same] sort.'" (quoting *Campbell*, 510 U.S. at 590)).  Accordingly, the market effects of SDI's appropriation of the Subject Photographs weighs against a finding of fair use.

Under the fourth factor, courts may also consider any benefit to the general public from the defendant's copying.  *See Hachette Book Grp.*, 115 F.4th at 195 ("Although [the defendant] cannot disprove market harm, we still balance the benefit the public will derive if the use is permitted [against] the personal gain the copyright owner will receive if the use is denied." (second alteration in original) (internal quotation marks omitted)).  As discussed above, SDI has presented no evidence that the offending Instagram posts served a genuine educational or critical function.  Instead, the only public benefit apparent from the Instagram posts was increasing the number of people who had the opportunity to enjoy the Subject Photographs and creating the potential for further discussion regarding them.  But in *Hachette Book Group*, the Second Circuit rejected the

notion that merely expanding public access to a given work qualifies as a sufficient public benefit under the fourth factor. *Id.* at 195-96 (observing that "monopolistic power is a feature, not a bug, of the Copyright Act" and stressing that "[i]f authors and creators knew that their original works could be copied and disseminated for free, there would be little motivation to produce new works"). The Court therefore concludes that SDI's Instagram posts do not provide a sufficient public benefit to overcome the market harm caused by its copying of the Subject Photographs.

### 5. Weighing the Factors

The final step of the fair use analysis "is to weigh the four statutory factors together, along with any other relevant considerations[,] . . . 'in light of the purposes of copyright.'" *Tveyes*, 883 F.3d at 180 (quoting *Campbell*, 510 U.S. at 577-78). In this case, while the Subject Photographs had been published before at least some of the offending Instagram posts and straddle the line between creative and factual, those considerations are substantially outweighed by the fact that SDI copied each photograph in its entirety for commercial, non-transformative purposes and without paying Nixon the customary licensing fee to do so. *See Otto*, 345 F. Supp. 3d at 433 ("The fact that [the defendant's] commercial use did not transform the Photograph's purpose or add new meaning to the image; the fact that [the defendant] used the work in its entirety; and the potential harm to any financial opportunities [the plaintiff] might reasonably pursue for use of the photo, outweigh the fact that the image is factual and published."); *Ferdman*, 342 F. Supp. 3d at 542 (rejecting a fair use defense as a matter of law where the defendant's secondary use was "a wholly untransformative and unaltered copy of [the plaintiff's] photographs"). And regardless of whether SDI acted in good faith, in failing to pay Nixon the usual price for a license, SDI's copying usurped the market for the Subject Photographs in a manner that, if it were to become widespread, would do significant damage to the rights of professional photographers. Finally, the Court does not perceive any public benefit from SDI's copying sufficient to offset the injury to Nixon's rights.

Accordingly, taking all relevant factors into consideration, the Court holds that SDI's fair use defense fails as a matter of law on the record presented.

**B.      Whether SDI's Infringement of Nixon's Copyrights Was Willful Presents a Question for the Trier of Fact.**

Nixon also seeks summary judgment on the issue of whether SDI acted willfully in infringing his rights in the Subject Photographs.  Motion at 9-13.  Although civil copyright infringement is a strict liability offense, *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 89 (2d Cir. 2016), the Copyright Act provides that "[i]n a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000."  17 U.S.C. § 504(c)(2).  "Copyright infringement is 'willful' if the plaintiff shows (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights."  *Stokes v. MilkChocolateNYC LLC*, 681 F. Supp. 3d 226, 238 (S.D.N.Y. 2023) (quoting *Island Software & Comput. Servs., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005)); *see also Castillo v. G&M Realty L.P.*, 950 F.3d 155, 170 (2d Cir. 2020) ("A violation is willful when a defendant had knowledge that its conduct was unlawful or recklessly disregarded that possibility.").

Nixon argues that SDI willfully infringed his rights in the Subject Photographs based on several categories of evidence, including that: (1) the Subject Photographs were registered with the Copyright Office and had been featured on public websites that identified "Nitro" as their owner; (2) the Subject Photographs were not hosted on any of the authorized websites listed in SDI's copyright policies; (3) SDI had obtained licenses to use images from other photographers in the past; (4) SDI used three of the Subject Photographs after having previously received a cease-

and-desist letter concerning the P. Diddy Photograph; and (5) SDI has been sued many times in the past for copyright infringement.  Motion at 11-13.

While some of these facts may be relevant to proving willfulness at trial, the Court cannot conclude that the present record establishes willfulness as a matter of law.  There is no evidence, for example, that there was any copyright information on the copies of the Subject Photographs that SDI's contributors used to make the offending Instagram posts.  Nor is there any evidence that SDI's contributors copied the Subject Photographs from any of the websites that Nixon contends listed him as their owner.  A trier of fact could also reasonably consider SDI's copyright policies and prompt removal of the offending Instagram posts after having received Nixon's cease-and-desist letters[2] in concluding that SDI did not have actual knowledge of, recklessly disregard, or remain willfully blind to Nixon's rights.  Thus, whether SDI acted willfully in infringing Nixon's rights in the Subject Photographs presents a factual issue not amenable to resolution through summary judgment in this case.  *See Shihab*, 2024 WL 3461351, at *8 (declining to resolve the issue of SDI's willfulness as a matter of law on a similar record).

**C.    The Court Denies Nixon's Motion as to His Claim for Vicarious Liability and Contributory Infringement.**

Finally, Nixon moves for summary judgment against Northstar on his claim for vicarious liability and contributory infringement.  Motion at 13-16.  As noted, however, Northstar is not a party to this litigation.  The operative Second Amended Complaint does not name Northstar as a Defendant or purport to assert any claims against Northstar, and nobody has entered an appearance on Northstar's behalf.

---

[2] Although three of the offending Instagram posts were made after SDI received Nixon's February 3, 2023 cease-and-desist letter concerning the P. Diddy Photograph, those later Instagram posts involved other photographs, and there was no indication in the first cease-and-desist letter that those photographs also belonged to Nixon.  *See* Paladino Decl., Exh. 7.

Apparently realizing the problem, Nixon abruptly changes course in his Reply brief, seemingly abandoning the arguments for summary judgment against Northstar that he initially raised in his Motion and arguing instead that summary judgement on his vicarious liability and contributory infringement claim should be granted against SDI.  *See* Reply at 10-11.  But the Court "is free to disregard argument[s] raised for the first time in reply papers, especially on a motion for summary judgment."  *Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009).  And if ever there was a time to exercise that discretion, this is it.  Plus, the parties' joint pre-motion letter to the Court, in which Nixon requested leave to file the instant Motion, made no mention that he would be moving for summary judgment on his claim for vicarious liability and contributory infringement, whether against Northstar or SDI, Dkt. 36, and the Court did not authorize a briefing schedule for a motion regarding that claim, Dkt. 37.  *See* Individual Rules and Practices in Civil Cases 6.A (requiring pre-motion letters to summarize "the basis for the anticipated motion").  Nixon's failure to comply with the Court's Individual Civil Rules provides an additional, independently sufficient basis to deny this portion of the Motion.  *See, e.g.*, *Scott v. WorldStarHipHop, Inc.*, No. 10 Civ. 9538 (PKC), 2012 WL 1592229, at *4 (S.D.N.Y. May 3, 2012).

Accordingly, the Court denies Nixon's Motion to the extent that it seeks summary judgment against Northstar and/or SDI on his claim for vicarious liability and contributory infringement.

## IV.  Conclusion

For these reasons, the Court grants summary judgment in favor of Nixon on his claim against SDI for copyright infringement as to the Subject Photographs.  The Court denies Nixon's Motion as to the issue of willfulness.  The Court also denies the Motion as to Nixon's claim for

vicarious liability and contributory infringement.  The Clerk of Court is respectfully directed to

terminate the motion pending at Docket Number 38.

      SO ORDERED.

Dated: December 23, 2024
      New York, New York

                               JOHN P. CRONAN
                       United States District Judge